**Daniel NATALE; Kathleen Natale, Appellants**

v.

**CAMDEN COUNTY CORRECTIONAL FACILITY; County of Camden; Camden County Sheriff's Department; Prison Health Services, Inc. John Doe, MD 1–5; Richard Roe, 1–5**

No. 01–3449.

United States Court of Appeals, Third Circuit.

Argued June 27, 2002.

Filed Feb. 7, 2003.

Saul J. Steinberg (Argued), Sufrin, Zucker, Steinberg, Waller & Wixted, Camden, NJ, for Appellant.

Kevin W. Lynch (Argued), White & Williams LLP, Westmont, NJ, for Appellee.

Before AMBRO and STAPLETON, Circuit Judges, O'NEILL,* District Judge.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

We decide two issues: whether New Jersey law required Daniel and Kathleen Natale (collectively, the "Natales"; in the singular, the reference is to Daniel Natale) to file an affidavit of merit in order to state a medical malpractice claim, and whether the Natales provided sufficient evidence of a governmental policy or custom for their claim under 42 U.S.C. § 1983 to survive the motion of Prison Health Services ("PHS") for summary judgment. The District Court dismissed the Natales' malpractice claim on the grounds that New Jersey law required the filing of an affidavit of merit that they did not submit. The District Court granted summary judgment to PHS on the Natales' § 1983 claim because it concluded that they had not pre-

---

* Honorable Thomas N. O'Neill, Jr., United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

sented any evidence of a policy or custom at PHS that deprived Daniel Natale of his constitutional right to adequate medical care.

We reverse and remand both rulings. Because the Natales' malpractice claim falls within the "common knowledge" exception to the affidavit requirement, they did not need to submit the affidavit of a medical expert. In addition, the Natales produced sufficient evidence of a policy or custom at PHS that deprived Daniel Natale of his right to adequate medical care to survive a motion for summary judgment.

## I. Background

On the evening of November 23, 1997, Gloucester Township police arrested Daniel Natale, an insulin-dependent diabetic. Before transporting him to the Camden County Correctional Facility ("CCCF"), the police took him to the emergency department of John F. Kennedy Memorial Hospital for a medical clearance prior to incarceration. The physician treating Natale at the hospital gave him a dose of insulin, and wrote a note stating that Natale "must have insulin" while incarcerated. The note did not, however, indicate how often the insulin should be administered.

At 3:30 a.m. on November 24, 1997, Natale arrived at CCCF, where, as part of his initial processing, employees of PHS, a private company that provides health services to CCCF inmates, performed a medical screening. Natale informed PHS employees that he was an insulin-dependent diabetic, and a PHS employee noted this

fact on Natale's chart. There is no indication in the record that the PHS employee screening Natale ever asked him how often he needed insulin. Natale was then admitted to the general prison population.

At 12:30 a.m. on November 25, 1997, twenty-one hours after being admitted to CCCF, Natale received his first dose of insulin at that facility. He was released later the same day. Two days later, Natale suffered a stroke. Attributing this stroke to the failure of PHS to administer insulin during the first twenty-one hours of his incarceration. Natale and his wife, Kathleen Natale, filed suit in New Jersey state court on March 9, 1999, alleging medical malpractice and violations of 42 U.S.C. §§ 1981 and 1983. Defendant Camden County removed the action to the United States District Court for the District of New Jersey. Discovery proceeded over the course of the next year.

On July 26, 2000, the District Court ordered *sua sponte* that the Natales show cause why their medical malpractice claim should not be dismissed for failure to state a claim, citing the Natales' failure to comply with N.J. Stat. Ann. § 2A:53A-27 (the "affidavit of merit statute"), which requires the plaintiff in a malpractice case to file an expert affidavit attesting to the merit of the plaintiff's claim.[1] The District Court also entered summary judgment in favor of CCCF, the County of Camden, and the Camden County Sheriff's Department (the "County Defendants") on the Natales' § 1983 claim, and dismissed the Natales' § 1981 claim as to all defendants.[2]

---

**1.** The District Court also ordered that the Natales show cause why the claims they had pleaded against fictional defendants should not be dismissed. On October 26, 2000, the Natales moved to amend their complaint pursuant to Fed.R.Civ.P. 15 in order to substitute two former PHS employees for the fictional

defendants. The Magistrate Judge denied this motion on December 21, 2000, and the Natales have not sought review of that order.

**2.** The Natales also have not sought appellate review of this order.

On July 24, 2001, the District Court issued an order dismissing the Natales' medical malpractice claim for failure to state a claim as a result of their failure to file an affidavit of merit. On July 30, 2001, the District Court granted PHS's motion for summary judgment on the Natales' § 1983 claim. The District Court's orders dismissing the Natales' malpractice claim and granting summary judgment in favor of PHS on their § 1983 claim were final orders, and the Natales' appeal of both was timely. We have jurisdiction under 28 U.S.C. § 1291.

## II. Discussion

### A. Dismissal of the Natales' Medical Malpractice Claim

We review *de novo* the dismissal of the Natales' New Jersey malpractice claim. *Island Insteel Sys. Inc. v. Waters*, 296 F.3d 200, 206 (3d Cir.2002). The Natales argue that because the issue of negligence in this case was one that could be resolved from the jury's common knowledge without expert testimony, there was no need for an affidavit of merit, citing to the Supreme Court of New Jersey's recent decision in *Hubbard v. Reed*, 168 N.J. 387, 774 A.2d 495, 499–500 (2001) (holding that no affidavit of merit need be filed in "common knowledge" malpractice cases).

A successful malpractice claim requires a plaintiff to show, *inter alia*, that a duty of care existed and that the defendant breached that duty.[3] *Rosenberg v. Cahill*, 99 N.J. 318, 492 A.2d 371, 374 (1985). In the typical malpractice case, the duty of care, or "the standard of practice to which the defendant-practitioner failed to adhere[,] must be established by expert testimony." *Id.* (quoting *Sanzari v.*

*Rosenfeld*, 34 N.J. 128, 167 A.2d 625, 628 (1961)). But where "the jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts," *Estate of Chin v. Saint Barnabas Med. Ctr.*, 160 N.J. 454, 734 A.2d 778, 785 (1999), "the jury itself is allowed 'to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto.'" *Rosenberg*, 492 A.2d at 374 (quoting *Sanzari*, 167 A.2d at 632). The factual predicate for a common knowledge case is one where "'the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience.'" *Estate of Chin*, 734 A.2d at 785–86 (quoting *Rosenberg*, 492 A.2d at 375).

The New Jersey legislature enacted the affidavit of merit statute as part of a tort reform package "designed to strike a fair balance between preserving a person's right to sue and controlling nuisance suits." *Palanque v. Lambert–Woolley*, 168 N.J. 398, 774 A.2d 501, 505 (2001) (internal quotation marks omitted). The statute requires the plaintiff in a malpractice action to file "an affidavit of an appropriate licensed person [stating] that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices." N.J. Stat. Ann. § 2A:53A–27. The penalty for not following the statute is severe: absent a showing of extraordinary circumstances, the failure to file the affidavit within sixty days of the filing of the answer "shall be

---

**3.** Of course, as in any negligence claim, the plaintiff must also show that the breach of duty caused his or her injuries, and that he or she suffered damages as a result. *See Rosen-* *berg v. Cahill*, 99 N.J. 318, 492 A.2d 371, 374 (1985) (noting that a medical malpractice case is "essentially no different from an ordinary negligence case").

deemed a failure to state a cause of action." § 2A:53A–29. This requirement "curtail[s] frivolous litigation without preventing access to the courts for meritorious claims." *Palanque*, 774 A.2d at 505.

■ Where, however, common knowledge makes apparent a claim's merit, an expert's affidavit is unnecessary. *Hubbard*, 774 A.2d at 499–500. In these cases, "the threshold of merit should be readily apparent from a reading of the plaintiff's complaint . . . [and] an expert is no more qualified to attest to the merits of a plaintiff's claim than a non-expert." *Id.* at 500. The District Court concluded that in this case "the crucial issue is whether defendant failed to timely administer medication to Mr. Natale, an insulin-dependent diabetic," and that "[t]he acceptable professional standard for treating an insulin-dependent diabetic is not within a lay person's common knowledge such that PHS's negligence can be determined without the benefit of the specialized knowledge of experts."

We disagree. A reasonable jury could conclude that PHS personnel were negligent absent expert testimony. PHS personnel failed to call Natale's treating physician to determine how often he needed insulin to be administered. They didn't even ask Natale. When "defendant's careless acts are quite obvious," *Palanque*, 774 A.2d at 506, no affidavit of merit is required. While laypersons are unlikely to know how often insulin-dependent diabetics need insulin, common sense—the judgment imparted by human experience— would tell a layperson that medical personnel charged with caring for an insulin-dependent diabetic should determine how often the diabetic needs insulin. No special expertise or expert testimony is needed to show, at the outset of a case, that the claim is not frivolous. The New Jersey Supreme Court's decision in *Hubbard* sup-

ports this view; thus no affidavit of merit need be filed. The District Court's decision to dismiss the Natales' malpractice claim for failure to file such an affidavit was therefore erroneous, and we reverse.

### B. *Dismissal of the Natales' 42 U.S.C. § 1983 Claim*

The District Court granted summary judgment to PHS on the Natales' § 1983 claim on the ground that they failed to provide any evidence "that a decisionmaker for PHS established a policy or well-settled custom of ignoring the medication needs of inmates at CCCF." We review the decision *de novo. Fogleman v. Mercy Hosp., Inc.,* 283 F.3d 561, 566 n. 3 (3d Cir.2002). We may affirm for any reason supported by the record, even if not relied on by the District Court, *Nicini v. Morra,* 212 F.3d 798, 805 (3d Cir.2000).

Summary judgment is proper if, when viewed in the light most favorable to the Natales, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Bailey v. United Airlines,* 279 F.3d 194, 198 (3d Cir.2002). A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party. *Fakete v. Aetna, Inc.,* 308 F.3d 335, 337 (3d Cir. 2002) (quoting *Cloverland–Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.,* 298 F.3d 201, 210 (3d Cir.2002)). Because there is evidence from which a reasonable jury could conclude that PHS had a policy failing to address the immediate medication needs of CCCF inmates with serious medical conditions, we conclude that the District Court erred in granting summary judgment in favor of PHS on the Natales' § 1983 claim.

■ To establish a claim under 42 U.S.C. § 1983, a plaintiff must demon-

strate a violation of a right protected by the Constitution or the laws of the United States committed by a person acting under the color of state law. *Nicini*, 212 F.3d at 806. It is undisputed that PHS was acting under color of state law when it provided medical services to Daniel Natale,[4] and no federal laws are implicated by the actions of PHS employees. Thus we focus on whether PHS employees violated Natale's constitutional rights.

■ When evaluating a claim brought under § 1983, we must first "identify the exact contours of the underlying right said to have been violated" in order to determine "whether [Natale] has alleged a deprivation of a constitutional right at all." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). If so, the analysis then shifts to a determination of whether the state actor, in this case PHS, can be held liable for that violation. *See Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir.2000).

### 1. *Violation of Natale's Constitutional Right*

■ As a threshold matter, we note that the District Court accepted the Natales' § 1983 claim for inadequate medical care as one arising under the Eighth Amendment right of a convicted prisoner to receive adequate medical care, articulated by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (finding that a failure to provide adequate medical care consti-

tutes cruel and unusual punishment). Daniel Natale was not, at any time relevant to this case, a convicted prisoner. Rather, he was a pre-trial detainee. While the Eighth Amendment prohibits the infliction of cruel and unusual punishment upon prisoners, it applies only "after [the State] has secured a formal adjudication of guilt in accordance with due process of law." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)).

■ In this context, the Natales should have pleaded their § 1983 claim as one based on the Due Process Clause of the Fourteenth Amendment. Their failure to do so does no lasting damage, however, as the Supreme Court has concluded that the Fourteenth Amendment affords pretrial detainees protections "at least as great as the Eighth Amendment protections available to a convicted prisoner," without deciding whether the Fourteenth Amendment provides greater protections. *Id.* In previous cases, we have found no reason to apply a different standard than that set forth in *Estelle* (pertaining to prisoners' claims of inadequate medical care under the Eighth Amendment) when evaluating whether a claim for inadequate medical care by a pre-trial detainee is sufficient under the Fourteenth Amendment. *See, e.g., Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir.1987).[5]

---

4. The District Court noted in its written opinion that "PHS concede[d] that it is a state actor." PHS did not appeal this conclusion.

5. As the issue was not raised before us, we do not decide whether the Due Process Clause provides additional protections to pretrial detainees beyond those provided by the Eighth Amendment to convicted prisoners. *See Gibson v. County of Washoe, Nevada*, 290 F.3d

1175, 1188 n. 9 (9th Cir.2002) (noting that "it is quite possible[ ] that the protections provided pretrial detainees under the Fourteenth Amendment in some instances exceed those provided convicted prisoners by the Eighth Amendment"). We have noted previously that the Due Process Clause provides "at a minimum, no less protection" than is provided by the Eighth Amendment. *Colburn v.*

■ We therefore evaluate the Natales' Fourteenth Amendment claim for inadequate medical care under the standard used to evaluate similar claims brought under the Eighth Amendment, the standard used by the District Court to evaluate the Natales' claim. In *Estelle*, the Supreme Court held that the Eighth Amendment proscribes deliberate indifference to prisoners' serious medical needs. 429 U.S. at 103–04, 97 S.Ct. 285. In order to establish a violation of Daniel Natale's constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir.1999).

Natale has established that he is an insulin-dependent diabetic. PHS does not dispute that this is a serious illness, and that Natale had a serious medical need. Because PHS is a state actor, employees of PHS are considered prison officials. The question, therefore, is whether PHS employees were deliberately indifferent to Natale's serious medical needs.[6]

■ Deliberate indifference is a "subjective standard of liability consistent with recklessness as that term is defined in criminal law." *Nicini*, 212 F.3d at 811. In *Farmer v. Brennan*, the Supreme Court held that finding a prison official liable for violating a prisoner's Eighth Amendment rights requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). He must be "both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and … draw the inference." *Id.* To survive a summary judgment motion on this issue, the Natales "must point to some evidence beyond [their] raw claim that [PHS employees] w[ere] deliberately indifferent," or put another way, some evidence "that [PHS employees] knew or w[ere] aware of [the risk to Natale]." *Singletary*, 266 F.3d at 192 n. 2.

In situations involving claims for inadequate medical care, we have found deliberate indifference in situations where there was "objective evidence that [a] plaintiff had serious need for medical care," and prison officials ignored that evidence. *Nicini*, 212 F.3d at 815 n. 14. We have also found deliberate indifference in situations where "necessary medical treatment is delayed for non-medical reasons." *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987) (citing *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir.1985)).

■ Sufficient evidence exists in the record that PHS employees were deliberately indifferent to Natale's serious medical needs to survive a summary judgment motion. First, as in *Nicini*, prison officials ignored the evidence of his need for insulin. Natale testified that he informed a PHS employee that he was an insulin-dependent diabetic, a PHS employee noted this fact on his chart, and he had a note from a physician indicating that he "must have insulin." A reasonable jury could conclude that PHS employees knew that Natale was an insulin-dependent diabetic and that if insulin was not administered as

---

*Upper Darby Township*, 838 F.2d 663, 668 (3d Cir.1988); *see also Simmons v. City of Philadelphia*, 947 F.2d 1042, 1067 (3d Cir.1991).

**6.** Producing evidence that PHS employees were deliberately indifferent to Natale's serious medical needs would, of course, only re-

solve the question whether he has alleged a violation of a constitutional right, not whether PHS itself can be held liable for its employees' violation of that right, discussed *infra* in Part B2.

required, he would suffer adverse health consequences. In addition, there is evidence that, as in *Monmouth County*, PHS employees delayed medical treatment for non-medical reasons—the PHS policy that failed to address the immediate medication needs of inmates with serious medical conditions. Nurse Lynda Sanferraro, a PHS employee, testified that PHS's "policy" was that a doctor would see inmates within 72 hours, but that there was no practice in place to accommodate inmates with more immediate medication needs.[7] A reasonable jury could find that such a practice constituted the delay of medical treatment for non-medical reasons. The Natales have, therefore, provided sufficient evidence to survive a motion for summary judgment on the question of whether PHS employees violated Daniel Natale's Fourteenth Amendment right to adequate health care while detained.

### 2. Liability of PHS for Its Employees' Violations of Natale's Constitutional Right

What remains to be determined is whether, for § 1983 purposes, the actions of PHS employees can be attributed to PHS itself.[8] PHS cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.[9] *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order for PHS to be liable, the Natales

7. Nurse Sanferraro testified as follows:

Q: So that from what you're saying, if somebody came in with this form, the first page of Lynda–2, a doctor would still have to assess Mr. Natale to determine what medications, if any, should be administered?
A: Yes.
Q: Do you know how soon it would have been for there to have been a determination of when Mr. Natale should have been examined by a physician?
A: I know there was [a] policy of within 72 hours.
* * *
Q: Is there anybody to your knowledge in PHS back in November of 1997 who would have been made or been responsible to determine if an inmate needed to be medically examined by a doctor earlier in the 72 hour period versus later in the 72 hour period?
A: There was no real determination on that.
* * *
Q: So that for the first 72 hours they may not be seen by the doctor; is that a fair statement? I'm talking about November of 1997.
A: In 72 hours they were seen by the doctor.
Q: Up until that point they're in Three South A?
A: Yes

Q: Unless they have obvious physical either a[sic] deformity or a problem with ambulation or something of that nature?
A: Yes.
Q: Do you know whether or not the medical assistant was supposed to report to anyone else if the medical assistant was made aware of a chronic condition of an inmate such as diabetes?
A: Can you repeat that?
Q: Yes. When the medical assistant took the assessment interview receiving screening and was told that an inmate is diabetic, what was the medical assistant supposed to do with that knowledge?
A: Write it on this form.
Q: That's it?
A: Yes.

8. While PHS employees may have violated Natale's constitutional rights, the Natales have not appealed the dismissal by the District Court of their claims against any defendants except PHS. Whether their § 1983 claim is viable, therefore, depends on whether the actions of PHS employees can be attributed to PHS.

9. *Respondeat superior* and vicarious liability are the theories under which courts "impose liability vicariously ... solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

must provide evidence that there was a relevant PHS policy or custom, and that the policy caused the constitutional violation they allege. *See Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

 Not all state action rises to the level of a custom or policy. A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir.1996) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." *Bryan County*, 520 U.S. at 404, 117 S.Ct. 1382.

 There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Bryan County*, 520 U.S. at 417, 117 S.Ct. 1382 (Souter, J., dissenting).[10] The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing

practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 417–18, 117 S.Ct. 1382 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Berg*, 219 F.3d at 276 (holding that plaintiff must "demonstrat[e] that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences").

 In this case, there is no evidence that PHS had an affirmative policy or custom that prevented its employees from inquiring into the frequency with which Natale required insulin. There is, however, evidence that PHS turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights.

The Natales allege that the failure to establish a policy to address the medication needs of inmates during the first 72 hours of their incarceration constitutes deliberate indifference to serious medical needs. We return to the testimony of PHS employee Lynda Sanferraro, and what a reasonable trier of fact could conclude from that testimony. According to Sanferraro, the policy at PHS for screening inmates was as follows: a medical assistant would inquire about an incoming inmate's medication needs, and write those needs in the inmate's medical records, but was not otherwise required to pass on that information. No one could provide an inmate with medication without having first obtained an order from a doctor. There was no requirement that a doctor see an inmate during the first 72 hours of incarceration and no one was charged with de-

---

**10.** We cite Justice Souter's dissenting opinion for its cogent and concise summary of the three situations in which a policy or custom sufficient to impose liability may arise, not its conclusion about the requisite evidentiary showing in those situations.

termining whether an inmate should be seen by a doctor earlier in the 72–hour period. As a result, there was no policy ensuring that an inmate having need of medication for a serious medical condition would be given that medication during the first 72 hours of his incarceration.

A reasonable jury could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs. The failure to establish such a policy is a "particular[ly] glaring omission" in a program of medical care. *Bryan County*, 520 U.S. at 410–11, 117 S.Ct. 1382. PHS "disregarded a known or obvious" consequence of its actions, *i.e.*, the likelihood that the medical conditions of some inmates may require that medication be administered within the first 72 hours of their incarceration. *Id.* at 412, 117 S.Ct. 1382. A reasonable jury could infer that "a system responsible for [assessing the medical needs of all incoming prisoners] would be the product of a decision maker's action or acquiescence." *See Berg*, 219 F.3d at 275 (holding that a reasonable jury could infer from testimony of police officer about system for issuing warrants that system was the product of a decisionmaker). It could also infer that the failure to establish a more responsive policy caused the specific constitutional violation of which the Natales complain, *i.e.*, the failure to administer insulin to Daniel Natale in a timely fashion. *See Bryan County*, 520 U.S. at 404, 117 S.Ct. 1382 (holding that plaintiff must demonstrate "a direct causal link between the municipal action and the deprivation of federal rights"); *see also Kneipp*, 95 F.3d at 1213 (holding that plaintiff must "establish that the government policy or custom was the proximate cause of the injuries suffered").

The Natales have provided the testimony of a witness who testified from personal knowledge about the policy for assessing the medical needs of inmates, and the gap in the procedure for patients with immediate and serious medication needs. Her testimony provides sufficient evidence from which a reasonable jury could infer that PHS was deliberately indifferent to the risk to inmates like Daniel Natale. Thus, the Natales' § 1983 claim against PHS survives summary judgment.

### III. Conclusion

For the reasons stated above, we reverse the District Court's order dismissing the Natales' malpractice claim and its order granting summary judgment in favor of PHS on the Natales' 42 U.S.C. § 1983 claim, and remand to the District Court for further proceedings consistent with this opinion.